BUCHANAN *against* THE OCEAN INSURANCE COMPANY.

The owner of the cargo, without request from the owner of the vessel, repaired her on the voyage; and effected an insurance in his own name, on his expenditures for repairs. *Held,* that he had not an insurable interest; that the repairs being voluntarily bestowed, belonged to the vessel; and the property of them vested in the owner.

ASSUMPSIT for a total loss on a policy of insurance; tried at the *New-York* circuit, in *January,* 1824, before ED-WARDS, C. Judge.

At the trial, the policy was produced, bearing date the 15*th* day of *March,* 1821; and was in the usual form of policies on vessels, commonly used by the insurance companies in the city of *New-York,* partly printed and partly written. The first part was as follows: "Vessel. By

The insurance was by a wagering policy, and against total loss only. The owner of the vessel had previously insured her; and after she had arrived at her port of destination, she was abandoned as for a technical total loss, by the owner, to his underwriters; and sold with their consent, and for their account. The owner of the cargo, who had made the repairs, then abandoned to his underwriters. *Held,* that this was not such a total loss as came within the policy; that a constructive total loss of the subject was not enough. But the loss must be absolutely and finally total.

The provision in a policy of insurance that the risk is against total loss only, means an absolute, not a mere technical total loss, whether the policy be a wagering policy or not.

A declaration on a policy of insurance upon a vessel, need not aver any interest in the assured: and if interest be averred, this may be rejected as surplusage.

The Ocean Insurance Company. *A. C. Buchanan,*" (the plaintiff.) "On account of whom it may concern, in case of loss payable to *A. C. B.*, do make insurance, and cause to be insured, lost or not lost, at and from *Newport* to *Londonderry*, upon the body, tackle, apparel and other furniture of the good ship called the *William and Jane.*" It was what is called an open policy ; the usual blank for the valuation not being filled with any thing; this clause in the policy standing thus : "The said vessel, tackle, &c. hereby insured, are valued at      , without any further account to be given by the assured, or any of them for the same." The premium was one *per cent.* The clause relative to the payment of loss and proof of interest, was in blank as to the person in whom the interest was to be proved ; and was as follows : "In case of loss, such loss to be paid in 30 days, after proof of loss and proof of interest in the said      ; the amount of the note given for the premium, if unpaid, being first deducted." The policy contained the usual printed clauses as to other insurance, &c., and was underwritten as follows : "$6500. Six thousand five hundred dollars. The above insurance is hereby declared to be on amount disbursed for repairs of the said vessel at *Newport*, to which place she returned in distress, and is against total loss only." (*Signed by the President, &c.*) On the margin of the policy was written as follows : "It is hereby agreed to take the additional sum of two thousand dollars, on this risk, at the same rate of premium, being also on amount of repairs disbursed at *Newport*. *New-York*, 19th *March*, 1821." (*Signed by the President and attested by the Secretary.*)

The policy being admitted, the plaintiff read, as preliminary proof, an abandonment by the plaintiff as for a total loss, previous to the vessel's arrival at *Londonderry*, dated *August* 25th, 1821, an affidavit and statement shewing the amount of repairs at *Newport*, &c. &c. which were admitted to have been duly furnished.

The following are the other material facts, as they appeared at the trial : the vessel, *Wm. W. Polke*, owner, sailed originally, on the 24th of *December*, 1820, *John*

UTICA,
Aug. 1826

Buchanan
v.
Ocean Ins. Co.

*Brown*, master, from *New-York* for *Londonderry*, laden with a cargo of flax seed, belonging to the plaintiff; naval stores, staves and other articles. On the 25*th* of *December*, she encountered severe weather, and was finally obliged to put into *Newport* in distress, where she arrived the 2*d* of *January*, 1821. Here she underwent the usual surveys and repairs, which were completed on the 1*st* of *March*, 1821. The repairs amounted to $9005,30, which sum was paid by the plaintiff's agent. On the 7*th* of *March*, the vessel sailed from *Newport*. She arrived on the *Irish* coast the 27*th*, and took a pilot, and came to at *Quigley Point, Loughfoyle ;* and after part of the cargo was taken out by lighters, in attempting to go up to the quay of *Londonderry*, she ran aground on the south side of *Tuor Patch*, and was not got off and brought to the quay till the 12*th* of *April*. She was there, on survey, found to be much injured, and incapable of repair, at *Londonderry*, for want of a dry dock. Nor could she be hove out ; and it was extremely hazardous to send her to *Glasgow* or *Liverpool*. It was the opinion of the surveyors that she should be sold at *Londonderry*. She was accordingly sold for account, and with the consent of the agent of the *London* insurers, on the 18*th* or 19*th* of *June ;* and purchased by the captain as agent for the owner, *Polke*, for £550—$2200, or thereabouts. The plaintiff arrived at *Londonderry*, after the sale. The captain knew nothing of the plaintiff's insurance, at the time of the sale ; though he knew the vessel was insured at *Lloyd's*. She could not have been repaired at *Londonderry*, for less than £2100—$8,200. On the 8*th* of *July*, she sailed for *Liverpool*, the plaintiff sailing there with her, where she arrived on the 10*th* of *July*, 1821. There she went into dry dock, and was repaired in 12 or 14 days. About the 18*th* of *August*, the captain chartered her for *Philadelphia*. The expense of the repairs at *Liverpool* was not precisely ascertained ; but the captain thought they could not be less than $3500 ; and that after being repaired, she might have been worth from 8 to $10,000. After the vessel returned to *Philadelphia*, she was sold and sent to the

*East Indies.* The owner had, before the insurance in question was made, insured the vessel at *Lloyd's, London,* for £3000 sterling—$13,320 ; and he had been paid as for a total loss by the underwriters there, deducting the £550, for which the vessel sold ; and when the defendants made insurance, they knew of the one made at *London,* which was from *New-York* to *Londonderry.* The plaintiff admitted himself, at *Liverpool,* to be the agent of *Polke.* The former had no interest in the ship ; nor was he a member of the firm of *Wm. Buchanan & Co.,* the consignees at *Londonderry,* of both vessel and cargo. The plaintiff abandoned, as before mentioned, on the 25*th* of *August,* 1821.

UTICA,
Aug. 1826.

Buchanan
v.
Ocean Ins. Co.

Verdict, by consent, for the plaintiff, for $9,901,37, subject to the opinion of the court on a case ; and with liberty to either party to turn the case into a bill of exceptions or special verdict.

The following points were now made for the plaintiff :

1. Such a loss as authorized an abandonment to the underwriters on the vessel, authorized an abandonment on the policy on the disbursements.

2. There was a technical total loss of the vessel.

3. Though there was a prior insurance on the vessel to her full value, yet this insurance is valid.

4. No interest in the vessel was necessary.

5. Though the vessel was restored when the abandonment was made, this did not destroy the right to abandon ; for the subject continued to be totally lost.

*C. D. Colden,* for the plaintiff. This is the common form of a policy, when it is intended to insure something collateral to the body of the vessel or property ; and the points all hang on the question, whether there was a total loss. This depends on the facts. The loss of the vessel was necessarily a loss of the repairs. The company knew that the plaintiff had no interest in the vessel ; and that they were insuring something distinct from the body of it. They insure disbursements for repairs expressly ; and it is evident from the case, that they perfectly understood

UTICA,
Aug. 1826.

Buchanan
v.
Ocean Ins. Co.

what they were insuring. They knew that a loss which should transfer the whole subject matter, would be the ground of an action on the policy. An abandonment of the vessel passed the repairs insured, to the underwriters at *Lloyd's.* The owner was not bound to forbear the abandonment on his part, for the benefit of the plaintiff. The provision in the policy, that it should extend only to a total loss, must be construed to mean, as in other cases, either a physical or technical total loss. The meaning is the same in this as in any other policy. The only difficulty with which we can be met on the nature of the loss is, that the vessel arrived at her port of destination. But it is now well settled, that this will not prevent the loss being total. (*Beawes' Lex Merc.* 298, 311, 4th ed. cited 1 *T. R.* 189. *Phil. on Ins.* 400. 11 *John.* 295.) We do not deny, that if the subject was restored when the abandonment was made, all right had gone. It was not so. It was totally lost ; and never was restored to the plaintiff. It could not be ; for it had passed to the other underwriters, and then, by the sale, to the purchaser. Indeed, an abandonment in the plaintiff's case was not necessary. It is never necessary, where you can claim nothing from it. It does not affect the rights of the parties. (8 *John.* 246. 2 *id.* 155. *Phil. on Ins.* 382.) The plaintiff had nothing which he could abandon. It might have been a technical total loss as to the vessel, but it was physically total as to the plaintiff. (3 *John. Cas.* 34.) A party insuring profits, may recover, on proof that the cargo is lost. Here the incidental loss is equally certain. This is precisely like the case of an insurance of profits against a total loss only. (1 *John.* 435, 439.)

No doubt the vessel was insured by the *London* policy ; but the defendants knew this ; and the insurance in question is good, unless the *London* policy covered the repairs. The one who has insured the vessel is never received as an insurer on the profits also. The clause in the policy relating to other insurances, can only apply to the very subject insured at the time.

The plaintiff clearly had an insurable interest. His interest was to have the voyage go on.

But the words of the policy dispense with the necessity of showing interest. If it were a mere wagering policy, it is not void according to our law. But it is not a wagering policy. The plaintiff had expended every cent he got insured.

*T. A. Emmett,* (same side) cited 1 *B. &. P.* 316 ; 1 *Burr.* 489 ; *Marsh. on Ins.* 150 ; *Park on Ins.* 374 ; *Ph. on Ins.* 490, 1 ; 1 *Wheat.* 219 ; 6 *Mass. Rep.* 119 ; 1 *John Cas.* 226 ; 6 *Mass. Rep.* 318 ; 4 *Bin.* 386 ; 15 *Mass. Rep.* 341 ; 3 *B. & P.* 308 ; 4 *Dall.* 421 ; 3 *Rob. Adm. Rep.* 288 ; 1 *Peters' Adm. Rep.* 223 ; 4 *Bin.* 539, *per Tilghman, C. J.* ; 5 *Serg. & Rawle,* 473 ; 12 *Mass. Rep.* 214 ; 11 *John.* 233 ; 1 *id.* 249.

*G. Griffin,* contra. The clauses relied on as peculiar, by the other side, are now very common. If it be admitted, as it must be, that the *London* policy covered the vessel, then it follows that it cannot be covered by this, which provides in terms against such a case. Not only the value of the vessel when she sails, but all subsequent repairs, are covered by an insurance on the vessel. By the settled rule of the English law, the whole would be covered. (12 *East,* 655, *per lord Ellenborough, C. J.* 4 *Taunt.* 367.) Suppose a wagering policy to be good ; this is not one. (1 *Condy's Marsh.* 121. 1 *T. R.* 304. 3 *Caines' Rep.* 141.) The declaration avers interest in the plaintiff. This he must establish, or fail for the variance. This is not a mere matter of form. It is the very git of the case. The payment made for repairs was made by the plaintiff, as agent for *Polke,* the owner, who, for aught that appears, has re-imbursed him. An insurable interest always involves the right to abandon. Here was no such right. The nature of the interest should have been specified in the policy. Clearly the plaintiff had nothing which was insurable, without being so specified. (2 *John. Cas.* 250. 2 *John. Rep.* 346. 7 *id.* 522. 4 *B. &*

A. 582.)    The policy mentions repairs.    But it does not mention who the owner was; and could we dream that the plaintiff would insure repairs on another's vessel?    It is wrong to consider this an insurance on profits.    If it be so, where is the total loss against which we are to insure?

The words *total loss*, mean an actual or physical total loss.    This is clearly so, if, as contended for the plaintiff, the policy is a wagering one. (3 *Caines' Rep*. 141.) The words, providing against any thing short of a total loss, mean the same thing as these words, "warranted free from average, unless general."    That clause, like the one in question, has been construed to exclude a technical total loss.    (*Phil. on Ins*. 489.  6 *Mass. Rep*. 471, &c. per *Sewall, J*.  1 *Condy's Marshall*, 227.  16 *East*, 214.  7 *Taunt*. 154. 2 *M. & S*. 371. 1 *Wheat*. 219, 224. 1 *John. Cas*. 226.  1 *Caines' Rep*. 196, 212.  3 *Caines' Rep*. 108, 14 *John*. 138.)

Here was neither a technical nor physical total loss. There was no loss of voyage, either as to vessel or cargo. The vessel remained, as a vessel.    Suppose the plaintiff had an election to abandon, he was not bound to do it. And not doing so, it would certainly have been a partial loss only.    There is no evidence, whatever, that the repairs at *Liverpool* amounted to 50 per cent.    This being so, there was no right to abandon.    It lay with the assured to shew the extent of the loss.    (3 *Caines' Rep*. 149.) Taking all the evidence, there is nothing like a loss to 50 per cent, after deducting one third new for old.

But the subject was completely restored before abandonment. This is conclusive.  (4 *Cowen*, 222.  5 *id*. 63.) The repairs never could come to the hands of the insured.    When the vessel was restored, the repairs were restored.    They are a part of the vessel.

We are aware of the rule of law, that different individuals may be insured, as to different interests in the same subject.    Thus, a lien may be insured; bottomry may be insured, &c. &c.    But the plaintiff had no lien; or if he once had a lien, he parted with it, when he parted with the possession of the vessel.    But he proved no lien at any time.

*D. B. Ogden*, (same side.) There cannot, in the nature of things, be any loss without interest; without something to lose.    And in such a case the assured cannot recover except on a wager policy.    (*Park on Ins.* 359.) Wager policies were bad at the common law. (*id.* 346. 1 *Burr.* 492.)    It will be seen by examining the authorities, that, as the common law stood before our revolution, there can be no doubt on the subject ; and one question is, whether we are bound to follow the English courts in their adoption of a different rule afterwards.    Before 1775, these wagering policies were unknown to the law of this state. Two cases have been before this court, (*Juhel* v. *Church*, 2 *John. Cas.* 333, and *Clendining* v. *Church*, 3 *Caines' Rep.* 141,) relative to these policies ; and by neither was their validity sanctioned.    Neither case passed upon the question of their validity ; though, it is true, that in the last, a wagering policy was admitted to be good by counsel. *Bunn* v. *Riker*, (4 *John.* 426,) *Mount* v. *Waite*, (7 *John.* 434,) and *Campbell* v. *Richardson*, (10 *John.* 406,) decided that wagers at common law are valid.    But all these cases agree in the qualification, that if they are against public policy they are utterly void.    Wager policies are clearly against public policy.    At any rate, there can be no doubt of this as to the policy in question.    To be consistent with sound policy, the contract of insurance should never be more than a contract of indemnity.    If it be more, it is a departure from the first principles of insurance law. This was so held expressly, and on the single point being presented, in *Amory* v. *Gilman*, (2 *Mass. Rep.* 1.)    In that case, it was decided, in so many words, that "a wager policy is not a valid contract."    The practice of making wagering policies was finally found to be so great an evil in *England*, that it was abolished by the 19 *Geo.* 2, which brands it in the preamble as pernicious.

But why should we contend the point here ? The variance is fatal.    An interest is averred, but not proved.    The insurance is not on repairs ; but on the money expended for repairs.    Suppose there had been a bottomry bond for the money : the insurance would not operate upon that,

UTICA,
Aug. 1826.

Buchanan
v.
Ocean Ins. Co.

because it is not named. So of the repairs. These not being named, the insurance cannot reach them.

Suppose the plaintiff had a lien; he was bound to enforce it at *Londonderry* in a court of admiralty, where he would have got his money. His omission to do so, authorizes us to infer that his money has been paid to him. At any rate, the omission was his own fault. There could have been no loss without that fault; and for this we are not amenable. The obligation of the underwriters is entirely complied with.

But the object of repairing had been answered. The vessel reached her port of destination; and the risk then ended. The vessel was not irreparable; but was repaired, without expending one half her value. (4 *Bin.* 386.)

Here was no right of abandonment. (10 *John.* 177.) There can be no such thing as a sale where there is but one man to be both vendor and vendee.

*T. A. Emmet*, in reply. If the insurance upon repairs is kept distinct from that upon the vessel, and *Buchanan* from *Polke*, much of the apparent difficulty of the case will be removed. If the plaintiff had an insurable interest, it is no matter whether it was covered by the English policy or not, so long as *Polke* is considered the owner, as he must be upon the case. The English insurance was not for the benefit of the plaintiff. With him, therefore, there is no double insurance.

But we deny that double insurance is contrary to commercial law. It is only contrary to the special contract of the parties. The effect upon the assured is, that he can receive but one indemnity, whatever be the number of insurances he may have effected. Out of these he may elect which; and this may come upon the others for contribution. This was never said to be against commercial policy. It cannot be that the *London* underwriters must pay for a partial loss on repairs; and then a total loss on the ship.

The subject is truly specified in the policy. It is the repairs in which the plaintiff had an interest. This was

enough. It was not necessary he should have an interest in the ship. He stood in a relation to the repairs from which he had a right to expect the worth of them. He had no personal remedy for his expenditures against *Polke;* nor does it appear that the repairs came within the English policy. They were put on the ship without the consent of *Polke,* who was probably unable to advance the amount. He might, therefore, refuse to pay. The whole was voluntary with the plaintiff.

The plaintiff is in conscience entitled to redress; and the court will, in order to promote justice, sustain a wagering policy. They will do this, at least, where they see no other remedy can be had.

But the interest is an insurable one. Payment for the repairs is, at all events, to be made to *Buchanan;* in justice, if the repairs were voluntary; in law too, if they were made at the request of *Polke.* No matter who owned the ship. The value of the repairs was due to *Buchanan.* Suppose this to be a wagering policy because there was no technical legal interest, there is enough to sustain it as a wagering policy. *Kulen Kemp* v. *Vigne,* (1 *T. R.* 304,) was much such a case as this. There the action would have been sustained, had there been a total loss. The validity of wagering policies has been repeatedly acknowledged by this court. When we allow an insurance on profits, we admit what comes very near a wagering policy, as in *Juhel* v. *Church,* (2 *John. Cas.* 333.) But several of the cases, which I cited on the opening, shew that the plaintiff had a lien for the price of the repairs; and such an one as might have been enforced by a court of admiralty. Less than this will give an insurable interest. (*Phil. on Ins.* 27. 5 *B. & P.* 269. 1 *Marsh. on Ins.* 105. 1 *B. & P.* 316.) It makes no difference, according to these authorities, whether the plaintiff could have paid himself by virtue of the English insurance, or not. The original interest cannot be affected by this consideration. But he could not recover upon the English policy. The whole went with the abandonment to the English underwriters, including the repairs. (*Phil. on*

*Ins.* 477.) He could not go against them unless he was the owner. Each person interested may insure his own interest. (*Phil. on Ins.* 41. *Marsh. on Ins.* 105. *Park on Ins.* 374.)

No doubt the provision in the policy excludes an average loss. But I deny its application to this case. It does not apply when the subject itself is lost. Physical loss is not necessary to be shown. It may be by capture. (*Phil. on Ins.* 488, 490, 491. 6 *Mass. Rep.* 318.) Such a loss would be within this policy. Any thing creating a total loss, without a mere depreciation of the property, is within the policy. The technical total loss of the ship, resulted in the actual total loss of the incidental subject matter, the repairs, and the remedy for their value. The lien was gone by the sale. The purchaser came in under a different and paramount right, a new title. The *London* underwriters directed the sale. The title was in them ; and the repurchase did not revest the lien. The owner had a right to abandon ; (11 *John.* 295 ; *Phil. on Ins.* 400 ; 4 *Bin.* 386 ; 15 *Mass. Rep.* 341 ; 3 *John. Cas.* 34 ;) and the underwriters at *Lloyd's*, to accept the abandonment. The plaintiff had no control over the right. He had no hold on the ship at the time of the abandonment, by which he could secure his lien. At least, there is no evidence that he had.

The amount of repairs at *Liverpool* had nothing to do with the right of the owner to abandon. The ship had been damaged more than 50 *per cent.* on her voyage. And it is her state at the place of destination, where she was abandoned and sold, which is to determine the right. We go upon the abandonment, and acceptance in good faith, as taking away all our right.

It was not necessary for us to abandon. There could be no salvage. (4 *Dall.* 421. 5 *B. & P.* 310. 1 *John.* 433.) It was an idle ceremony. Nothing could pass by it. We did, however, abandon.

*Curia, per* SAVAGE, Ch. J. The question first in order, is, had the plaintiff any insurable interest in the ves-

sel ? The insurance is upon the body, tackle, apparel and other furniture of the good ship called the *William and Jane*. Afterwards is the following clause : " The above insurance is hereby declared to be on amount disbursed for repairs of the said vessel at *Newport ;* to which place she returned in distress, and is against total loss only."

UTICA,
Aug. 1826.

Buchanan
v.
Ocean Ins. Co.

The plaintiff expended in repairs at *Newport*, $8,500 ; *(a)* at whose request, or by what authority, the case does not state. The owner of the cargo, not being the owner of the vessel, is not bound to repair. It is the duty of the owner of the ship, or his agent, the master, to see the vessel repaired, when necessary. The plaintiff told the captain at *Liverpool*, that he acted as agent of *Polke*, the owner. Whether he acted as agent of the owner at *Newport*, does not appear. If he did, then the repairs at that place were properly recoverable of the *London* insurers. (12 *East*, 655.) Lord *Ellenborough* there says, " there may be cases in which, though a prior damage be followed by a total loss, the assured may nevertheless have rights or claims in respect of that prior loss, which may not be extinguished by the subsequent total loss. Actual disbursements for repairs, in fact made, in consequence of injuries, by perils of the seas, prior to the happening of the total loss, are of this description. The vessel was insured in *London*, by *Polke*, the owner. If he paid for the repairs at *Newport*, he had a claim for those repairs upon the *London* underwriters. They were covered by the *London* policy, whether the policy by the defendants be a double insurance or not. If the plaintiff was not the agent of the owner at *Newport*, what interest did he acquire by making the repairs voluntarily ? He took no bottomry nor other security upon the vessel, which the master was authorized to give ; nor did he receive any security from the owner. Did he then acquire any lien upon the vessel ? It is conceded the plaintiff had no interest in the vessel. What interest had he ? The cases cited shew that a lender on bottomry may insure his interest ; but it must be by name, and not an insurance on the ship. A

*(a)* The amount stated ante, 320, includes some items of disbursement at *Newport* beside repairs.

consignee of the cargo, and an assignee, may insure. Any one, in short, who has a lien on the ship or cargo, may insure the property on which his lien attaches. How could the plaintiff have proceeded to enforce his lien, if he had one upon the ship? He had indeed paid money in repairing the ship, which he was not bound to pay; and I am now supposing the money paid voluntarily. I know of no proceeding which he could have had, *in rem*, to have sold the vessel to reimburse himself. The money was paid for the benefit of the owner; but he might have preferred to have the captain raise the funds with those means which were authorized by law. The captain might have borrowed money. He might, under certain circumstances, have sold or hypothecated the cargo. In the case of *Dickey* v. *The N. Y. Ins. Co.* (4 *Cowen*, 222; 5 *Cowen*, 66, *S. P.*,) the captain did sell part of the cargo, and hypothecate part of it; and though it was strongly urged, that the ship was bound to the cargo, as the moneys thus raised were expended in repairs; yet this court said, there was no lien on the vessel, as it was not pledged for the payment. The present case is certainly not stronger: The captain, I will suppose, might have sold or hypothecated the plaintiff's flax seed, for the $8,500, expended in the repairs. According to *Dickey's* case, the lender on respondentia would have had no lien on the vessel. Here the owner of the cargo, being present, prefers to raise the money rather than have his property sold or hypothecated for that purpose. Can he be in a better situation than one who should advance his money? Whatever remedy the plaintiff in this case may have, I am not authorized to say that he had a lien on the vessel. No analagous case has been cited. I am well warranted, therefore, in saying none can be found. Nor do the writers on insurance enumerate any such demand as an insurable interest. (*Phil. on Ins.* 57. 1 *Marsh. on Ins.* 104. *Park on Ins.* 374.)

I am bound, therefore, to conclude, that the plaintiff had no insurable interest in the vessel. The repairs had become part of the vessel; and having no lien for the money expended, he had no insurable interest in that.

But suppose it were otherwise, and his interest were admitted : it is contended the defendants are not liable ; the insurance being against *total loss only.*

In the case of *Murray* v. *Hatch,* (6 *Mass. Rep.* 465,) the policy was in the usual form, except that at the bottom was a memorandum in these words : *This risk is against a total loss only.* The vessel was cast ashore ; and though she might have been got off, and repaired for less than half her value, the master having no funds, sold her. It was held that the insurer was not liable. *Sewall,* Justice, who delivered the opinion of the court, considered this memorandum a restriction to some purpose. It was considered as having the same effect as exceptions and warranties against particular averages and partial losses, in what is called *the common memorandum.* The general principle in cases on such exceptions and warranties is, that the insurer is liable as for a total loss, when the subject matter is destroyed, or when the voyage is defeated and lost. In *Nelson* v. *The Col. Ins. Co.* (3 *Caines' Rep.* 108, 110,) the insurance was on corn, with the usual memorandum. The court say, so long as the corn physically existed, there could not be a total loss. (*See also* 14 *John.* 138.)

Whether there was, in this case, a technical total loss ; whether an abandonment was necessary ; or if so, whether it was made in due season, are questions not neccessary to be discussed, upon the view which I have taken.

The only remaining question is, whether the plaintiff is entitled to recover as upon a wager policy ? In these policies, the person insured is not required to have any interest in the thing insured. Wagering policies are mere games of hazard, like the casting of a die. (*Doug.* 470.) It is to be regretted, that wagers ever were allowed to be the subject of an action. Wagering policies were, however, lawful in *England,* before they were prohibited by statute. They are unlawful in *Massachusetts.* But they have been recognized by this court.

In the case of *Juhel* v. *Church,* (2 *John. Cas.* 333,) in the body of the policy, $12,000 were insured on goods for

Buchanan
v.
Ocean Ins. Co.

the voyage ; but by a memorandum in writing, it was declared to be on profits. ˙ No proof of interest was to be required, and the goods were warranted free from average and without benefit of salvage. The ship returned to *New-York* in ballast, finding no goods on the Spanish main, whither, and back, she was insured. *Kent*, Justice, says, " I consider this as a wager policy. It was betting on the return of the ship." In that case, it was made a point, whether a wager policy was void. *Kent*, Justice, says, " But supposing the policy to be good, (and I wish not to be understood as intimating any opinion to the contrary,) I am equally of opinion that the plaintiffs are not entitled to recover." In *Clendining* v. *Church*, (3 *Caines' Rep.* 141,) the court considered the policy in the light of a wager policy.

The averment of interest is not necessary, in a wager policy, nor in a policy upon interest ; (2 *East*, 392 ;) and may therefore be considered surplusage.

It is then settled, that a wager policy is a bet upon the arrival of the ship. The perils which happened during the voyage are immaterial. Her arrival determines the bet. *Kent*, Ch. Justice, in giving the opinion of the court, in *Clendining* v. *Church*, says, " In wager policies, the loss should be absolutely and finally total ; for otherwise, a temporary embargo of only one day, without any other interruption of the voyage, would be a total loss, although the vessel should have arrived in safety."

In whatever light, therefore, this case is considered, it seems to me, the plaintiff cannot recover.

I am of opinion that judgment be given for the defendants.

Judgment for the defendants.