Selden, J.
By the policy upon which this action is brought, the defendants insured the life of Ira D. Bugbee, for the term of his natural life, for the sole use of the plaintiff, in consideration of the sum of $97.40 in hand paid, “ and of the annual premium of ninety-seven dollars and forty cents, to be paid on or before the tenth day of April in every year during the continuance” of the policy; and by a subsequent clause it was provided that, in case the plaintiff should not pay the said annual premiums “ on or before the day” previously mentioned for the payment thereof, the policy should “ cease and determine.” A memorandum upon the back of the policy indicated its date to be the 10th day of April, 1846, although it was not actually delivered until the 15th of July of that year. Bugbee died upon the 13th or 14th of April, 1847, and at that time the premium for the second year of the policy had not been paid. It was, however, tendered, on or about the day of Bug-bee’s death, to the defendants’ agent, who refused to receive it.
From this brief statement it is plain that, if we are to look to the policy alone, as containing the contract between the parties, the obligation of the defendants ceases upon the failure of the plaintiff to pay the annual premium upon the 10th day of April, 1847. Nothing could be more explicit than the language of the policy on this subject, and no reason can be given why this provision should not take effect according to its terms, unless it is to be regarded as modified by the printed prospectus issued by the defendants and delivered by their agent to the plaintiff before his application for the policy. The clauses in the prospectus upon which the plaintiff relies are the following, viz,:
“Every precaution is taken to prevent a forfeiture of the policy.”
“ A party neglecting to settle his annual premium within thirty days after it is due, or paying assessments within the sixty days specified within the charter, or refusing to give satisfactory security upon the note, forfeits the interest he has in the policy.”
These clauses are not connected in the prospectus, but are several-pages apart from each other.
*519 The question first to be considered on this subject is, whether the prospectus is to be treated as part and parcel of the contract between the parties. It was not referred to in, nor in any manner annexed to, the policy. Nothing is better settled than that, where two parties have entered into a written contract, all previous negotiations and propositions in relation to such contract, whether parol or written, are to be regarded as merged in the final agreement. Such preliminary matter may sometimes be admissible under the rule which admits evidence of the surrounding circumstances for the purpose of explaining an ambiguous expression; but never where the terms of the contract are clear and explicit. The legal inference, in all such cases, if the contract varies from what has been previously said or written, is, that the parties, upon further consideration, have changed their views. Policies of insurance are no exception to this rule, as a brief reference to the cases on the subject will clearly show.
It was held by Lord Mansfield, in the case of Pawson v. Barnevelt, that a written memorandum in regard to the subject of insurance, which was shown to the underwriter at the time of subscribing, and then wrapped up in the policy, did not thereby become a part of the contract; and, in the subsequent case of Bize v. Fletcher, the same judge ruled that a strip of paper, describing the condition of the ship insured, although watered to the policy itself, was to be regarded as a representation merely, and not as a part of the policy. (Doug., p. 12, note 4.)
It has, however, been decided in this State that where, in making the policy, the insurance company used a printed form covering one-half of a sheet, upon the other half of which was a printed memorandum, headed “ conditions of insurance,” this memorandum was to be treated as a part of the contract. The juxtaposition of the papers is, in such a case, considered as affording prima facie evidence that such was the intention of the parties. (Roberts v. The Chenango Mut. Ins. Co., 3 Hill, 501; Murdock v. The same, 2 Comst., 210.) No case seems to have gone further than these, in incorporating extrinsic documents into a policy of insurance.
*520 Where the collateral writing is referred to in the policy itself, it has been held, both in England and in this country, that such writing is to be taken as a part of the contract. (Routledge v. Burrell, 1 H. Bl., 254; Wood v. Worsley, 6 Term R., 710; Duncan v. The Sun Fire Ins. Co., 6 Wend., 488.) In the last of these cases, it was said by Cowen, J., that such memoranda “ have the same force and effect as if contained in the body of the policy.” It would seem, however, from the subsequent cases in this State, that to give them this effect, they must' be referred to in terms, as forming a part of his policy, or at least in such a manner as to show that this was intended. (The Farmers' Ins. and Loan Co. v. Snyder, 16 Wend., 481; Burritt v. The Saratoga Co. Mut. Fire Ins. Co., 5 Hill, 188; Jenninys v. The Chenango Mut. Ins. Co., 2 Denio, 75; Egan v. The Mut. Ins. Co. of Albany, 5 Denio, 326.) There is, therefore, not the slightest authority for holding, that any preliminary or collateral writing whatever, which is neither annexed to nor referred to in the policy, can be taken as a part of the contract of insurance; and the general principles of law are directly opposed to any such doctrine.
But it is contended, that if the prospectus is not to be regarded as incorporated into the contract itself, it is nevertheless obligatory upon the company as a representation. Undoubtedly a written or printed statement delivered by the agent of the company to an applicant for insurance, relating directly to- the insurance applied for, may amount to a representation on the part of the company; but, as a representation merely, the prospectus in this case cannot cannot aid the plaintiff. A representation' by the assured, if false, avoids the policy. Here it is not sought to avoid, but to enforce the policy. The only mode, therefore, in which the prospectus can be made to aid the plaintiff is, by treating the company as absolutely bound, by its terms, to the same extent as if it had been incorporated into the policy. The Supreme Court accomplished this, by holding the company estopped, by the terms of the prospectus; but this was clearly a misapplication of the doctrine of estoppel. It has never, I think, been held *521 when the conditions of a contract proposed in the preliminary negotiations between the parties, varied from the contract as finally consummated, that, although such conditions form no part of the contract, they may, nevertheless, operate as an estoppel upon the parties. The reasons given why these introductory propositions do not become incorporated into the contract, viz.: that they are presumed to have been subsequently waived or abandoned, conclusively repel all idea of an estoppel in such a case.
It follows, that the policy must be considered as embracing the entire contract between the parties; and the plaintiff must abide by the explicit provision, that the policy should cease and determine in case of a failure to pay the premiums according to its terms.
But assuming, that the prospectus became a part of the policy, and had the effect to modify its provisions in respect to the time for the payment of the premium, it is still insisted, that there could be no recovery without proof that the- plaintiff had an interest in the life of Bugbee. In considering this point, it is necessary first to ascertain, by what law the question is- to be determined. The contract was actually made between the plaintiff and an agent of the defendants, in. the State of Georgia; but the defendants, as is to be inferred from the case, were incorporated in the State of New Jersey, and the policy purports upon its face to have been executed at the city of Newark in that State. Under these circumstances, although the suit is brought ini this State, the interpretation and validity of the contract cannot depend upon the laws, of New York. The lex fori governs, as- to the remedy or remedies for enforcing the contract, but not as to its construction, or the legal rights arising under it.- These depend usually upon the laws of the place where the- contract is to be performed ; although where there is anything in the circumstances to show that the parties had specially in view the law of the plane where the contract is made, this law will govern, although the contract is to be performed elsewhere. I see nothing in the présent case to indicate that the parties contracted with *522 special reference to the law of Georgia. As no other place was mentioned, payment was of course to be made in New Jersey, where the principal office of the company was located. The contract was to be performed there, and hence, upon the general principle adverted to, the validity of the contract and the rights and obligations of the parties under it, must depend upon the law of New Jersey.
The defendants upon the trial read two sections from the statutes of New Jersey, as having some bearing upon the point under consideration; but neither of these can, in my view, affect the question. The only one which could reasonably be supposed to do so, is the following: “ All promises, agreements, notes, bills, bonds, contracts, judgments, mortgages, or other securities or conveyances which shall be made, given, granted, drawn, entered into, or executed by any person or persons, when the whole or any part of the consideration of such promises, agreements, notes, bills, bonds, contracts, judgments, mortgages, or other securities or conveyances shall be for money, goods, chattels, or other valuable thing or things whatsoever, were laid or betted, at cards, dice, billiards, tennis, bowls, shuffleb.oard, or any other game or games, or any cockfighting, or other sport or pastime, or for the reimbursing or repaying any money knowingly lent or advanced at the time and place of such play, cockfighting, or other sport or pastime, to any person or persons, so gaming, laying or betting, or who shall, at such time and place, so play, lay or bet, shall be utterly void and of none effect."
This section does not reach this case. It avoids all contracts made for money, &c., won or betted at any game or games, or upon cockfighting or other sports. It is aimed particularly at games, and does not avoid wagers in general. The policy in this case had nothing to do with any game or sport of any sort, and is not, therefore, within the purview of the act. Hence its construction and effect must depend upon the general laws of New Jersey, which, as no evidence was given on the subject, are presumed to be the same as the common law of this State. Our inquiry, therefore, is, whether at common law, *523 independent of any statute, it is essential to the validity of a policy, obtained by one person for his own benefit upon the life of another, that the party obtaining the policy should have an interest in the life insured.
A policy, obtained by a party who has no interest in the subject of insurance, is a mere wager policy. Wagers in general, that is, innocent wagers, are, at common law, valid; but wagers involving any immorality or crime, or in conflict with any principle of public policy, are void. To which of these classes, then, does a wagering policy of insurance belong?
Aside from authority, this question would seem to me of easy solution. Such policies, if valid, not only afford facilities for a demoralizing system of gaming, but furnish strong temptations to the party interested to bring about, if possible, the event insured against. In respect to insurances against fire, the obvious temptation presented by a wagering policy to the commission of the crime of arson has generally led the courts to hold such policies .void, even at common law. It was so held in England, at an early day, by Lord Chancellor King, in Lynch v. Dalzell (4 Bro. P. C., 431), and by Lord Hardwicke, in Saddlers' Company v. Badcock (2 Atk., 557); and the courts in this country have generally acquiesced in and approved of the doctrine. In this State such policies would fall under the condemnation of our' statute avoiding all wagers and gambling contracts of every sort; but they would, no doubt, also be held void, independently of that statute, at common law. In Howard v. The Albany Insurance Company (3 Denio, 301), Bronson, Ch. J., asserted the necessity of an interest in the assured in all such cases, referring, in support of the doctrine, not to the statute, but to the decisions of the Lord Chancellors King and Hardwicks (supra).
In regard, however, to marine insurances, a different rule seems to have prevailed in England; and the cases of Clendining v. Church (3 Caines, 141), Juhel v. Church (2 John. Cas., 333), and Buchanan v. Ocean Insurance Company (6 Cow., 318), are supposed to have established the same rule in this State. No reason, that I am aware of, has ever been given for this *524 difference between fire and marine policies. The latter, when of a wagering character, are vicious and evil in their tendencies as well as the former, and have been generally considered as noxious and dangerous, whenever the question has arisen. They should, therefore, as it would seem, for the reasons applied to policies against fire, have been held void, as contrary to public policy.
The distinction between these two classes of policies is, in my view, a mere matter of accident, and grew out of the peculiar manner in which the question was presented in respect to marine policies. The case of Depaba v. Ludlow (Comyn, 861), shows how the doctrine, that wagering policies upon ships are valid, originated. The defendant there had insured the plaintiff, “ interest or no interest.” On the trial it was objected that the plaintiff could not recover, unless he had a property in the ship; but the court said that the insurance was good, and that the import of the clause, “ interest or no interest,” was, that the plaintiff had no occasion, to prove his interest. Had the question been directly presented in this case, whether a mere wagering policy was valid, the decision would, I think, have been different. The case itself shows the court to have supposed that the plaintiff actually had an interest; and it is apparent, from the authorities, that it had always been previously held, in suits upon policies not containing the words “interest or no interest,” or other equivalent words, that the plaintiff must aver and prove that he had an interest. This is distinctly asserted by Lord Habdwigke, in the case of Saddlers' Company v. Badcock (supra); and in the case of Craufo v. Hunter (8 Term, 14), the counsel, on looking into the pre dents at the request of the court, found that it had been t uniform practice, in suits upon marine policies, to insert í averment of interest. To me, therefore, it seems clear, thi the decision- in Depaba v. Ludlow was made because the corn failed to distinguish between a waiver of proof at the trial, which the defendant was, of course, at liberty to make, and a waiver in the policy itself, by which it was converted into a mere wager.
*525 In consequence of this case, and others which followed it, Parliament was forced to interfere, as it did, by the act of 19 George II (ch. 37), reciting the mischiefs which had arisen from the making of marine insurances, “interest or no interest,” and prohibiting them thereafter; and when the question subsequently arose in Crauford v. Hunter (supra), as to the validity at common law of a mere wagering policy upon a ship, it was held to be valid, solely upon the authority of the recitals in this act. It was in this indirect way that the doctrine in question, as to marine policies, first crept into the law. It was important to show this, because the effect of what I consider as the inadvertence of the court in Depaba v. Ludlow was not confined to policies upon ships. It must have been, I think, in consequence of the doctrine initiated by that case, that it came to be understood in England that, in insurances upon lives, it was not necessary at common law that the party to be benefited by the policy should have any interest in the life insured. There may not have been any direct decision to that effect; yet, that such was the prevalent impression, is to be inferred from the enactment of the statute of 14 George III (ch. 48), prohibiting insurances upon lives where the person insuring had no interest in the life. Angelí, in speaking of this statute, says: “ At common law it seemed to have been thought unnecessary that, at the time of effecting the policy, the assured should have had any interest which might be prejudiced by the happening of the event insured against." (Ang. on Life and Eire Ins., § 297.) In New Jersey they have no such statute; and the question now to be decided, therefore, is, whether the impression which seems to have prevailed in England prior to the statute of 14 George III was well founded.
That impression does not appear to be supported by any adjudged cáse. Life insurance seems not to have been practised to a great extent in England until a comparatively modern date, and the probability is, that as soon as such insurance became frequent, the evils of gambling in them was so apparent that Parliament interposed, upon the assumption *526 that the same rule would be applied to them as to insurances upon ships. I cannot regard that act as affording any very strong evidence, that, at common law, wagering policies upon lives were valid. It seems to me, that, were the naked question presented, whether such a policy comes within the admitted exception to the validity of wagers in general, that is, whether it is repugnant to a sound public policy, no court, not hampered by some unfortunate or mistaken precedent, would hesitate for a moment in holding the affirmative. In Massachusetts, in Vermont, in Pennsylvania, and I believe other States, it has been so held in regard to wager policies in general. But policies without interest, upon lives, are more pernicious and dangerous than any other class of wager policies; • because temptations to tamper with life are more mischievous than incitements to mere pecuniary frauds.
Chancellor Kent was evidently embarrassed by the position of this question in England. He commences his remarks on the subject by saying that “the party insuring must have an interest in the life insured,” and then immediately refers to the English statute, of 14 George III, chapter 48, but says not -a word upon the question whether at common law an interest was necessary. He, however, concludes by saying that “ the necessity of an interest in the life insured, in order to support the policy, prevails generally in this country, because wager contracts are almost universally held to be unlawful, either in consequence of some statute provision, or upon principles of the common law.” (3 Kent Com., 368.)
This obscure manner of treating the subject is plainly to be attributed to the reluctance of the learned author to admit (notwithstanding the impression that appears to have obtained in England), that gambling in life insurance could be tolerated at common law. That impression has been here traced, as I think, with justice to the very questionable doctrine of the English Courts in regard to marine policies. It has never, that I am aware of, been recognized and adopted by any American Court, and is so obviously repugnant to the plainest principles of public policy, that it is somewhat surprising that *527 it should ever have existed. My conclusion, therefore, is, that the statute of 14 George III, avoiding wager policies upon lives was simply declaratory of the common law, and that all such policies would have been void, independently of that act.
It is said that the defendants, by issuing the policy upon the representation of the plaintiff that he had an interest, have admitted his interest, and that the production of the policy is at least prima facie evidence of such interest. This position cannot be sustained. All the older authorities show, that even in actions upon marine policies, not containing the clause “ interest or no interest,” it was necessary to aver, and of course to prove, the interest of the plaintiff. It is an indispensable part of the plaintiff’s case, to be made out affirma tively at the trial. Upon this ground, therefore, as well as that before considered, the judgment of the Supreme Court must be reversed; and there must be a new trial, with costs to abide the event.
All the judges, except Davies and Mason, Js., concurred that the plaintiff must show an interest in the life insurance. On the question of evidence in respect to the prospectus being admissible as part of the policy or entering into the contract, Comstock, Ch. J., Davies and James, Js., dissented.
Judgment reversed, and new trial ordered.